I/YELVERTON, J.
This case presents a priority dispute between several holders of perfected agricultural security interests creating privileges under Chapter 9 of the Louisiana Commercial Laws. The sum of $33,469.04 was put in the Registry of Court to await the trial court’s determination of the ranking of the crop hens among three creditors. The main issue is whether a $20,000 payment, consisting of $14,000 in cash and a $6,000 promissory note, given to the highest ranking creditor to hold him off from repossessing the farmer’s tractor, had the effect of waiving or subordinating $20,000 of that creditor’s lien and privilege on the 1994 crop of sugarcane. The trial court found that it did. We reverse.
PACTS
Claude J. Guidry, d/b/a Claude J. Guidry Farms (Guidry) was a sugarcane farmer who gave crop pledges to various suppliers of equipment, services, goods, supplies, fertilizer, seed, and money to be used in his farming operations. He planted a crop in late 1992, and over the next two years gave crop pledges to Lanier Implement Co., Inc. (Lanier), G&H Seed Co., Inc. (G & H), and George J. Tate (Tate). These suppliers recorded UCC crop pledges as follows:
File No. Date Filed Secured Party Crop Year Amount
57-922163 11/17/92 Lanier 1992 $12,000
01-930523 3/22/93 G&H 1993 $35,000
57-930648 4/22/93 Lanier 1993 $15,000
57-930993 6/25/93 Lanier 1994 $23,500
57-930993 6/25/93 Lanier 1993 $ 8,500
01-941649 4/8/94 G&H 1994 $68,400
01-942681 9/29/94 G&H 1995 $18,000
57-941472 10/25/94 Tate 1994/95 $20,000
| gLanier’s main investment in Guidry’s sugarcane farming was the lease of a Case International Harvester tractor in 1993. The lease provided that payments were to be made over a period of four years from 1993 to 1997, with a purchase option at the end of that time. Each year, three payments of $2,700 and one of $9,887 were due totaling $17,987 a year.
Guidry executed two crop pledges to Lanier in 1993, each in the amount of $23,500 and each secured by a promissory note in a like amount, covering the sugarcane crops, with one note due in December of 1993 and the other due in December of 1994. As shown by the above list of filings, Lanier filed UCC-lFs in the amount of $15,000 and $8,500 for 1993, and $23,500 for 1994.
As further shown by the above list of filings, G & H, to secure its advances to Guidry, filed a crop pledge for 1993 in the amount of $35,000. For the 1994 crop year, G&H filed its crop pledge for $68,400; the latter filing was done on April 8,1994.
Guidry did not make his 1993 lease payments to Lanier. As 1994 began, Guidry owed Lanier $23,184.54. By the summer of 1994, with lease payments still falling behind, Guidry owed Lanier over $29,000. At this point, Lanier made known its intent to repossess the tractor. Guidry *571 needed a tractor to harvest the sugarcane in the fall of 1994. Guidry’s attorney, Charles J. Tate, and G & H negotiated a deal with Lanier that would allow Guidry to keep the tractor through January 15, 1995, in order to complete the harvest. G & H agreed to pay Lanier $14,000 in cash on behalf of Guidry, and Guidry executed a promissory note to Lanier for $6,000 endorsed by Charles J. Tate. In exchange for this $20,000, Lanier agreed not to repossess the tractor or do anything that would interfere with the 1994 harvest.
|aThe agreement between Lanier and G & H as to the $14,000 cash payment was in writing. It was dated August 3, 1994. The instrument was entitled “Agreement of Non-Interference.” In its entirety:
LANIER hereby agrees and promises, upon receipt of $14,000.00 paid by G & H on behalf of Claude J. Guidry Farms, not to interfere (in any manner) with the 1994 farming operation of Claude J. Gui-dry d/b/a Claude J. Guidry Farms. Such non-interference shall include, without limitation, dispossessing Claude J. Guidry of that certain 7150 Case I-H tractor presently under lease-purchase to Claude J. Guidry. This agreement does not require LANIER to extend any further credit to Claude J. Guidry Farms.
It is understood and agreed that this contract is also for the benefit of Claude J. Guidry, d/b/a Claude J. Guidry Farms. This agreement terminates on January 15,1995 as to LANIER.
As Guidry’s attorney, Tate prepared the Agreement of Non-Interference. Tate also prepared a promissory note for $6,000 made by Guidry to Lanier and endorsed the note, limiting his endorsement with the following language: “Endorsement absolutely conditional upon execution and full and complete performance of non-interference agreement with maker through January 15,1995.”
Lanier complied with its “Agreement of Non-Interference” for the required length of time, through January 15, 1995. Because it had received no further payments, Lanier then canceled the lease and took the tractor back. As of January 17, 1995, Guidry’s debt to Lanier, after application of the $20,000 and including interest charges, amounted to $37,448.07.
In late 1994, the harvest of the sugarcane crop began, and it was delivered to MA Patou Mill for processing. In 1994, G & H was paid $46,315.96 from crop proceeds. About half of that amount was from the 1993 crop and the rest was from the 1994 crop. After Lanier notified the mill that it, too, had crop pledges, the ^remaining seventeen checks from the 1994 crop were issued totaling $33,469.04, payable to G & H, Guidry, Tate, and Lanier. Some of the crop proceeds were received in 1995. This is the money in the registry of the court.
Lanier filed suit for a declaratory judgment naming G & H, Guidry, and Tate defendants. Lanier’s petition prayed to be declared the first ranking creditor with priority on the 1994 crop proceeds. Lanier sought a judgment of $37,448.07, the amount it claims Guidry owed it. Lanier also prayed for judgment against Guidry for $6,000, with interest and attorney’s fees, on the promissory note.
THE TRIAL COURT’S JUDGMENT
The trial court ruled that the $20,000 paid to Lanier was in effect a payment on the $23,500 crop lien for the 1994 crop year thereby reducing Lanier’s lien to $3,500. Even though Lanier was found to have priority over the other creditors, because his hen was reduced to $3,500 the judgment in his favor was limited to this amount. The remainder of the balance on deposit was awarded to G & H, the second ranking creditor. There was nothing left for Tate.
In its oral reasons for judgment, the trial court recognized that the non-interference agreement was an agreement by Lanier not to interfere with Guidry’s farming operations for a period of time upon *572 payment by G & H of $14,000, plus a $6,000 promissory note of Claude Guidry guaranteed by George Tate. The court then found that, although there was a conflict in the testimony between the plaintiff and defendant, the intent was that the $20,000 was to be credited to Guidry’s 1994 tractor lease payments and secured by Lanier’s crop hen of June 25, 1993. In later written reasons for judgment, the trial court restated this finding in the language “that the | s$20,000 payment made by the defendants to Lanier Implement on or about August 3, 1994 had the effect of reducing the plaintiffs lien by that amount.”
THE CONTENTIONS OF THE PARTIES
Lanier, the appellant, contends that the Agreement of Non-Interference was erroneously interpreted to mean that the $20,-000 payment reduced its hen as well as the debt. It denies that it agreed to subordinate or waive its hen rights. It denies any agreement requiring it to apply the payment to the 1994 lease payments, most of which had not yet come due. It argues also that the court erred in basing its calculations on the face amount of Lanier’s hen for $23,500, rather than on the underlying indebtedness due to Lanier. Finally, Lanier contends the trial court erred by only recognizing Lanier’s right to pursue its claim against Tate for his guarantee on the promissory note, instead of awarding Lanier a $6,000 judgment against Tate.
It was stipulated by the parties that all of the financing agreements involved in this case were filed under both Louisiana’s version of Article 9 of the UCC (La.R.S. 10:9-101, et seq.), and its laws regarding security devices affecting farm products (La.R.S. 3:3651, et seq.). Lanier contends the lower court had no basis for reducing its $23,500 hen on the 1994 crop just because it accepted a $20,000 payment on Guidry’s past due account. Lanier argues the application of La.R.S. 10:9-312(5) which in pertinent part provides the following:
(5) ... priority between conflicting security interests in the same collateral shall be determined according to the following rules:
(a) Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected,, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.
| fiLanier contends that it simply and properly apphed the $20,000 payment to Guidry’s open account, which consisted of charges made in connection with both the prior year’s and current year’s crop. G & H and Tate argue that the intent of the $20,000 payment was to reduce the lease obligation coming due on the tractor during the 1994 crop year.
It is unclear from the trial judge’s opinion whether this “intent” was found to have been implicit in the non-interference agreement or whether it was the product of a separate oral contract.
ISSUES
Tate did not file a brief. We will use the brief of the appellee, G & H, to frame the principal issues presented:
I.
What was the intention of the parties in negotiating and executing the “Agreement of Non-Interference”?
II.
Was the District Court correct in concluding that the payment by G & H and the endorsement by George J. Tate were intended to reduce the balance owed by Guidry for the 1994 sugarcane crop?
*573 THE EVIDENCE
Lanier took the $20,000 and applied it to Guidry’s debt. From the outset of its dealings with Guidry, Lanier treated Gui-dry’s growing indebtedness as an open account resulting not only from the accumulation of lease payments, but also from a number of other services, supplies, and goods provided. Lanier applied the $20,-000 to the' oldest debts. Louisiana Civil Code Article 1868 provides that when the parties |7have made no imputation, payment must be imputed to the debt that is already due. Under the specific language of the crop pledges by Guidry, Lanier was entitled to apply the payment made on Guidry’s behalf in any manner it chose without prejudice to its lien rights.
The trial court apparently believed that the parties intended to impute the payment to the 1994 tractor lease payments, thus reducing Lanier’s crop lien by $20,-000. We base this interpretation on the ruling of the court:
Although there is a conflict in the testimony between the plaintiff and defendants concerning the intent of the agreement, the Court finds that the $20,000.00 which was to be credited was to be credited to the 1994 lease payments due by Mr. Guidry on the lease of the Case tractor owned by Lanier and secured by Lanier’s crop lien of June 25th, 1993.
Charles Henderson, Jr., President of Lanier Implement, Inc., testified for Lanier, as did Evelyn Cole, office manager and accounting department manager. Testifying for G & H was Richard Latiolais, its credit manager. Charles Tate testified for himself, and G & H. All witnesses stated that the purpose of the non-interference agreement, which had been prepared by Tate, was to let Guidry keep the tractor and complete the crop.
Henderson testified that Lanier first started doing business with Guidry in October 1992. He explained their business— the lease of the tractor and other equipment, and the sale of parts and rendition of services. He explained that all unpaid lease payments, as well as other debts due by Guidry, were kept on an open account. He said that in the summer of 1994, Gui-dry owed them somewhere in the neighborhood of $29,000. He explained the crop pledges. He stated that the non-interference agreement was the result of his decision not to extend future credit unless Guidry paid up or paid a portion of his account. When the agreement was signed, he applied $20,000 to Guidry’s open account debt and allowed Guidry to remain in | «possession of the tractor through the term of that agreement. On cross-examination, he denied that there was ever any agreement between him and G & H to file crop liens simultaneously or on the same date. The UCC-1 filings corroborate his testimony. ' Henderson denied any verbal agreement that the $20,000 would be imputed to the debt for the 1994 crop year. Nor was there any agreement that the $20,000 would be placed as payment and as security for payment of the 1994 tractor installments as testified by Tate. There was no discussion about how the money was to be applied, according to Henderson. The nondisturbance agreement was strictly for not picking up the tractor. Henderson testified, “When they paid that money, they did not want us to pick the tractor up because they wanted — he needed the tractor to complete the crop. I believe they didn’t give a flip where that money went, because they were going to show it on their account to Claude Guidry, and they felt that at the end of the year, they were going to get paid out of their arrangement with Claude Guidry. And I don’t think they gave any consideration to where that money was going.” Evelyn Cole corroborated Henderson’s testimony that the payments were simply applied to Guidry’s open account.
Henderson’s analysis of what was going on in everybody’s mind has support in the testimony of both Latiolais and Tate. La-tiolais was not even aware Lanier had a ranking crop privilege to threaten G & H’s *574 1994 interest. Tate was not aware that Guidry owed Lanier a debt that went back before 1994. Even so, he thought as did Latiolais that the amount of acreage involved should have been enough to cover everybody.
Both Latiolais and Tate believed that some kind of subordination, or waiver, or credit against Lanier’s 1994 lien rights was generally understood to have been a part of the non-interference agreement. Tate prepared the non-interference 19agreement. He testified that the “primary purpose” of the agreement was for Lanier to allow Mr. Guidry uninhibited use of that tractor for the 1994 crop season. Tate was questioned by the G & H attorney as to why he agreed to guarantee the $6,000 note. It was in this testimony that the term “subordination” first made its appearance in the case. Tate stated that it was “implicit” in the discussions that he had, and “understood” by him, that the money was going for the tractor for the 1994 installments. He admitted that he was unaware that Guidry owed Lanier $29,789 when the non-interference contract was signed, but commented “with the amount of acreage involved, there should have been enough to cover everybody.” He admitted that he did not prepare a written subordination agreement.
Richard Latiolais testified that he represented the interests of G & H at negotiation meetings with Lanier in the summer of 1994, and that the purpose of those discussions was to reach some agreement that would allow Mr. Guidry to continue his farming operations. His testimony admits that Lanier never agreed to take a subordinate position to G & H. At the time of the non-interference agreement, Latio-lais was unaware that Lanier even had a crop lien on the 1994 crop.
Q. When you made the $14,000 payment, did you know at that time that Lanier had already filed their crop hen for that year?
A. No, I did not.
OPINION
The intention of the parties in negotiating and executing the “Agreement of Non-Interference” was to keep Lanier from interfering with Guidry’s 1994 farming operation. Since all that was left at that time was the harvest, it was to keep Lanier from interfering with the harvest between August 3, 1994 and January 15, 1995. The |10contract expressly included, without limitation, Lanier’s promise not to dispossess Guidry of the tractor during that term. We are unable to read into this contract an implied obligation to reduce its hen rights on the 1994 crop. A continuation of Lanier’s hen rights could in no way be construed as an interference with Gui-dry’s farming operation.
The second issue is whether the payment by G & H and the endorsement by Tate were intended to reduce the balance owed by Guidry for the 1994 sugarcane crop. Because we have found that such an intention was not manifest in the written agreement, G & H was required to prove that during the negotiations and execution of the non-interference agreement, there was confected a separate, oral contract.[1] G & H had to prove that there was an oral agreement to reduce the balance owed to Lanier by Guidry for the 1994 sugarcane crop.
A party who claims the existence of a contract between himself and his op *575 ponent has the burden of proving the existence of the obligation. La.Civ.Code art. 1831; Pennington Const., Inc. v. R.A. Eagle Corp., 94-0575 (La.App. 1 Cir. 3/3/95); 652 So.2d 637. An oral contract over $500 must be proved by at least one credible witness and other corroborating circumstances. La.Civ.Code art. 1846. To meet the burden of proof of an oral contract the contract must be proved by a wdtness and other corroborating circumstances. Id. A party may serve as his own witness. Pennington Construction, 652 So.2d 637. The corroborating circumstances that are required must come from a source other than the plaintiff. Id.
h-iWe infer from the trial judge’s reasons for judgment and written judgment that the defendants proved a verbal agreement that G & H would hold a $20,-000 lien superior over Lanier with respéct to the 1994 crop proceeds. This finding is manifestly erroneous. The only time that the expression “verbal agreement” was used during the trial was on cross-examination of Lanier’s witness, Henderson, and he answered that there was no such agreement. In the testimony, Tate used “understood” to explain that Lanier’s application of the payment was part of the noninterference agreement. Latiolais, too, described it as an “understanding.” Both Latiolais and Tate were asked by G & H’s counsel whether they “negotiated for a position” that would have achieved the hoped-for $20,000 difference in ranking. Latiolais replied that was correct. Tate was asked if the negotiations were toward the position wherein someone would be “equitably subordinated” and his answer was, “That was understood.” All of this vague testimony of an “understanding” describes a unilateral state of mind but it does not describe an objective framework of facts needed to establish a contract.
In its argument before the trial court, G & H argued “equitable subordination.” We are unfamiliar with this expression as a legal term of art, but we have some idea of what it means, and we disagree with its application to this case. The equities are not with G & H. It is our conclusion that their evidence was insufficient to meet the burden of proof of a verbal agreement to vary the terms of the “Agreement of NonInterference.” We do not reach the question of whether the testimony of Latiolais and Tate corroborated each other, because the testimony of neither, standing by itself, established an agreement to modify the written contract.
All the parties took the necessary , steps in perfecting their security interests. Therefore, their rank is determined by the date of filing. Lanier filed his crop lien for 112the 1994 crop year on 6/25/93,, G & H filed theirs on 4/8/94, and Tate filed his on 10/25/94. Thus, the trial court correctly found that Lanier had first priority, followed by G & H Seed, Inc., and then Tate.
This takes care of the liens on the 1994 crop. We hold that Lanier’s lien on the 1994 crop entitles it to the first ranking to the extent of its lien, $23,500. Deducting this from the $33,469.04 in the Registry of Court leaves $9,969.04. We are unable to determine from the evidence the exact amount still due G & H from the 1994 crop[2], but we are certain it is more than $9,969.04. Because G & H’s lien status is second in priority, it is entitled to all of this balance.
Lanier has also raised the issue that the trial court erred in fading to order Tate to honor his guaranty on the note and pay $6,000 to Lanier. Lanier did not pray for this relief in his petition. The suit on the note was against the maker, Guidry, only. Tate was not sued in the capacity of a personal guarantor. This part of the judgment is affirmed.
Accordingly, for the reasons assigned, we reverse the ruling of the court which *576 limited Lanier’s lien rights on the 1994 crop to $3,500. We render judgment recognizing Lanier’s rights to the amount on deposit are secured by its hen for $23,-500 on the 1994 crop. Judgment is rendered in favor of Lanier for $23,500 of the sum on deposit. Judgment is rendered in favor of G & H for the balance, $9,969.04, of the sum on deposit in the Registry of Court. Lanier and G & H will share proportionately whatever interest has accumulated on the sum on deposit. In ah other respects, the judgment of the trial court is affirmed.
^J^Lanier and G & H will share the costs of this appeal, and below, proportionately in accordance with their judgments.
AFFIRMED IN PART; REVERSED IN PART; RENDERED.

. Lanier in its brief argues that “under the caselaw” a waiver or subordination of statutory lien rights "should be express and in writing.” Lanier cited no caselaw to that effect, and we have found none. We note that La.R.S. 10:9-316 does not appear to limit the nature of the agreement that establishes a subordination. However, it is not necessary that we decide whether an agreement to subordinate, as between two lien holders, may be by oral communication, or even by course of conduct, as we have concluded in the present case that there was no oral agreement, much less a course of conduct, establishing an agreement to subordinate Lanier's lien rights to those of G & H.

. From our study of Latiolais' testimony, G & H’s Affidavit Creating Material Lien dated February 1995, G & H’s Accounts Receivable Statement (Exhibit # 3), and the letter to Homer Barousse, Jr. (Exhibit # 2), we calculate it is $20,286.85.